STATE OF CONNECTICUT *v.* GARY D. GIBSON
(AC 28273)

Bishop, Gruendel and Robinson, Js.

---

Argued December 1, 2008—officially released May 12, 2009

*David B. Rozwaski*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Christian M. Watson*, former assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Gary D. Gibson, appeals from the judgment of conviction, rendered after a jury trial, of failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1) and the judgment of the trial court, rendered following a hearing, revoking his probation pursuant to General Statutes § 53a-32 and imposing the remainder of his sentence. On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction of failure to appear in the first degree and (2) the court incorrectly found that he violated his probation. The defendant additionally claims that impropriety by the prosecutor violated his constitutional right to a fair trial. We agree with the defendant's allegation of prosecutorial impropriety and, accordingly, reverse the conviction on the

count of failure to appear in the first degree and remand the matter for a new trial. We affirm the judgment of the court in regard to the finding of violation of probation.

A warrant was issued for the defendant's arrest on November 28, 2005, charging him with stalking in the first degree under General Statutes § 53a-181c.[1] The defendant previously had been convicted of stalking in the second degree under General Statutes § 53a-181d on March 19, 2003, and his sentence included imprisonment followed by a two year period of probation.[2] Following his 2005 arrest, bond was set at $25,000 on the warrant, and the defendant was arraigned on December 12, 2005.

The record reveals the following facts underlying the November 28, 2005 stalking charge. The victim, who was the same victim in the case resulting in the defendant's 2003 stalking conviction, had arrived at Stop & Shop in Bristol on the evening of October 23, 2005, when he noticed a blue Jeep Liberty backed into a parking space along Pine Street. When the victim left Stop & Shop a few minutes later, he noticed that the Jeep was behind him, appeared to follow him to a Citgo gasoline station and continued to follow him as he proceeded home. The victim testified that he recognized the driver of the Jeep as the defendant because the

[1] "A person is guilty of stalking in the first degree when he commits stalking in the second degree as provided in section 53a-181d and (1) he has previously been convicted of this section or section 53a-181d, or (2) such conduct violates a court order in effect at the time of the offense, or (3) the other person is under sixteen years of age. . . . Stalking in the first degree is a class D felony." General Statutes § 53a-181c.

General Statutes § 53a-181d (a) defines stalking in the second degree as occurring "when, with intent to cause another person to fear for his physical safety, [a person] wilfully and repeatedly follows or lies in wait for such other person and causes such other person to reasonably fear for his physical safety."

[2] The defendant was also convicted of breach of the peace in the second degree in violation of General Statutes § 53a-181 on that date.

defendant was the person who had been convicted of stalking him on a previous occasion. The defendant was found not guilty on the stalking charge. The defendant was found guilty, however, of failure to appear in the first degree. The basis of the failure to appear charge is as follows. As part of the pretrial proceedings associated with the defendant's stalking charge, the defendant was scheduled to appear in court on April 4, 2006. That appearance, before the court, *Dunnell, J.*, consisted only of a brief exchange between the attorneys and the court.

"[The Prosecutor]: Twenty, twenty-one, pretrial docket, [the defendant].

"[Defense Counsel]: Good morning, Your Honor. Frank Canace for [the defendant]. I spoke with the state yesterday. I think we're looking for a date for victim's contact?

"[The Prosecutor]: Yes.

"[Defense Counsel]: May I have May 5, if that's convenient with the court?

"The Court: May 5?

"[Defense Counsel]: Yes, ma'am.

"The Court: Yes."

On May 5, 2006, however, the defendant did not appear in court. The defendant's attorney stated: "Your Honor, I have no way of contacting him. He knew today was the court date. I don't know why he wouldn't show up other than the fact that I believe it was going to go on the trial list today." The state requested a rearrest, and the court ordered the defendant rearrested. The bond was called and ordered forfeited by the court, and a new bond of $300,000 was set. After being notified that there was a warrant out for his arrest, the defendant turned himself in to the police on May 11, 2006. He was

convicted of failure to appear in the first degree on September 26, 2006, and, after a hearing, was found by the court to be in violation of his probation on October 4, 2006. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to support his conviction of failure to appear in the first degree. The defendant specifically claims that the state did not prove that his failure to appear in court on May 5, 2006 was wilful. As we conclude that this is an issue of credibility, we disagree.

The following additional facts are relevant to the defendant's claim. The defendant testified that approximately three weeks after his April 4, 2006 court date, he entered into the calendar on his cellular telephone the date of May 16, 2006, as his next court date. He testified: "I didn't write it down then I left court that day, and, apparently, I just forgot it, and I—for some reason, I thought May 16 was [the] court date [and] about three weeks later, and I entered it in my cell phone. And I thought for sure that was the court date from then on."

We first set forth the standard of review with regard to a sufficiency of the evidence claim. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the

basic and inferred facts underlying those conclusions need not be proven beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all of the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jason B.*, 111 Conn. App. 359, 363, 958 A.2d 1266 (2008), cert. denied, 290 Conn. 904, 962 A.2d 794 (2009).

General Statutes § 53a-172 sets forth the elements of the crime of failure to appear in the first degree. "[A] person is guilty of failure to appear in the first degree when (1) while charged with the commission of a felony and while out on bail . . . he wilfully fails to appear when legally called according to the terms of his bail bond . . . ." General Statutes § 53a-172 (a). "[T]he word wilful means doing a forbidden act *purposefully* in violation of the law. It means that the defendant acted *intentionally* in the sense that his conduct was *voluntary* and not inadvertent . . . . Thus, wilful misconduct is *intentional misconduct,* which is *conduct done purposefully* . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Outlaw*, 108 Conn. App. 772, 777, 949 A.2d 544, cert. denied, 289 Conn. 915, 957 A.2d 880 (2008). "In order to prove the wilful element of . . . § 53a-172, the state must prove beyond a reasonable doubt either that the defendant received and deliberately ignored a notice to appear or that he intentionally embarked on a course of conduct designed to prevent him from receiving such notice." (Internal quotation marks omitted.) *State* v. *Laws*, 39 Conn. App. 816, 819, 668 A.2d 392 (1995), cert. denied, 236 Conn. 914, 673 A.2d 1143 (1996). "Because direct

evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Rice*, 105 Conn. App. 103, 108, 936 A.2d 694 (2007), cert. denied, 285 Conn. 921, 943 A.2d 1101 (2008).

Sufficient evidence was presented at trial to sustain the defendant's conviction of failure to appear in the first degree. During its case-in-chief, the state placed in evidence the transcript of the defendant's April 4, 2006 court appearance. The defendant testified that he was present in court on April 4, 2006, when his attorney requested May 5, 2006, as the next court date. The date of the defendant's next court appearance was stated twice on the record in the defendant's presence, once by his attorney and once by the court. On April 4, 2006, the defendant's attorney stated that the purpose of the defendant's May 5, 2006 court appearance was for "victim contact." The state argued during its rebuttal that the fact that "victim contact" was scheduled for May 5, 2006, gave the defendant a reason to not appear in court intentionally on that date because at that point, the prosecutors would likely choose to move forward with the case, and the defendant was acutely aware of this, given his prior stalking conviction. The defendant did not contact his attorney or the court at any point after April 4 to confirm his May court date.[3]

---

[3] This case is distinguishable from *State* v. *Khadijah*, 98 Conn. App. 409, 415, 909 A.2d 65 (2006), appeal dismissed, 284 Conn. 429, 934 A.2d 241 (2007), in which this court reversed the defendant's conviction of failure to appear in the first degree where the evidence showed that on the day in question she had asked her boyfriend to wake her up if she fell asleep on the morning of her court date and that once her attorney telephoned her, she immediately went to court.

The court held that "[w]orking late the night before a court appearance, pursuant to a regularly kept work schedule, failing to set an alarm clock or asking a friend to awaken her from a potentially inadvertent doze does not amount to purposefully and intentionally absenting oneself from the courthouse." Id., 418. In the case at hand, unlike in *Khadijah*, the jury was

Under the standard of review applicable to the facts of this case, the jury reasonably could have found, on the basis of the evidence presented and the reasonable inferences to be drawn therefrom, that the defendant's actions were intentional and that he therefore wilfully failed to appear in court on May 5, 2006. Moreover, although the jurors could have accepted the defendant's uncorroborated testimony that he mistakenly believed that his court date was actually May 16, 2006, they did not.

We note that the trial judge acknowledged that this was a very close case. The court went so far as to state during sentencing that "I sat through the trial and heard the testimony. I must say that I did not think the state's case on failure to appear was overwhelming. It was a very close case. It could well have been—a reasonable person could have found the defendant not guilty on that and concluded that the defendant made a mistake about the date. The jury found him guilty, and I must give some deference to [its] determination and decision, which was reached by six people after a day or so of deliberation."

Although this is a very close case, "we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Jason B.*, supra, 111 Conn. App. 363. The jury listened to the defendant's testimony about why he missed his court date and chose to find him not credible; furthermore, the state put forth evidence regarding potential reasons why the defendant would not have wanted to be in court that day, and there was no question that he was present when his next court date was selected and announced. We conclude, therefore, that there was sufficient evidence from which the

presented with evidence from which it could have determined that the defendant wilfully failed to appear.

jury could have found the defendant guilty of failure to appear in the first degree.

The defendant additionally argues that because the transcript does not indicate that he was specifically addressed by the court regarding his next court date, this somehow bears on whether he wilfully failed to appear in court. The defendant has not provided any analysis of this claim, however, nor does he cite any legal authority that requires the court to address a defendant directly during this type of proceeding. "[W]here the parties cite no law and provide no analysis of their claims, we do not review such claims . . . ." *State* v. *Glenn*, 97 Conn. App. 719, 737 n.17, 906 A.2d 705 (2006), cert. denied, 281 Conn. 913, 916 A.2d 55 (2007).

## II

The defendant next claims that the prosecutor's remarks during closing argument amounted to prosecutorial impropriety,[4] and, as such, this court should set aside the conviction of failure to appear in the first degree.[5] We agree.

## A

During closing argument, while addressing the charge of failure to appear in the first degree, the prosecutor

---

[4] Although the defendant uses the term "prosecutorial misconduct" throughout his brief, we note that our Supreme Court has stated that "[t]he use of the term 'prosecutorial impropriety,' when reviewing allegedly improper statements by a prosecutor at trial, is more appropriate than the traditional term of 'prosecutorial misconduct' . . . . Prosecutors make countless discretionary decisions under the stress and pressure of trial. A judgment call that we later determine on appeal to have been made improperly should not be called 'misconduct' simply because it was made by a prosecutor." (Citation omitted.) *State* v. *Fauci*, 282 Conn. 23, 26 n.2, 917 A.2d 978 (2007).

[5] The defendant seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because he did not object to the prosecutor's statements during the trial. As review of a claim of prosecutorial impropriety is required under *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004), a *Golding* analysis is unnecessary.

stated: "[The defendant] admitted to knowing [and] standing in front of the judge and saying, yeah, I knew my court date was May 5. I heard it twice. He knew his court date was May 5, yet on May 5, where was [the defendant]? He wasn't in court. You heard the testimony from the [court] clerk. He was ordered rearrested. His bond was forfeited, and he was ordered rearrested. Why does a rearrest happen, Madam Clerk—when the defendant isn't in court? Did the defendant wilfully fail to appear in court on May 5, 2006? I think he did. Is it safe to assume [that the defendant], sometime after May 5, when he realized that he got rearrested, conveniently came up with the new court date of May 16? I think it's pretty safe to assume that, ladies and gentlemen."

Our Supreme Court "previously [has] recognized that a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–78, 961 A.2d 975 (2009).[6]

[6] To the extent that the dissent suggests that *State* v. *Cassidy*, 236 Conn. 112, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d

The defendant contends that the prosecutor's remarks were improper because a prosecutor is not permitted to inject a personal opinion regarding a defendant's guilt or a witness' credibility into closing argument. The state argues that the statements in question, the two statements beginning with "I think," were isolated instances and were proper rhetorical devices used while marshaling the evidence in the case.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 367–68, 924 A.2d 99, cert.

196 (1996), overruled in part by *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000), alters the prosecutorial impropriety analysis, we note that *Cassidy* explicitly was decided under the confrontation clause, rather than the due process basis traditionally employed in cases of prosecutorial impropriety. *State* v. *Cassidy*, supra, 129–32; see also id., 147 n.2 (*Callahan, J.*, dissenting) (stating that "[t]he majority does not engage in [a due process prosecutorial impropriety] analysis but rather finds a violation of the defendant's sixth amendment right to confront the witnesses against him").

denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

"It is not improper for a prosecutor to ask the jury to draw inferences and to exercise common sense. . . . A prosecutor may urge the jury to find for stated reasons that a witness was truthful or untruthful. . . . A prosecutor may also remark on the motives that a witness may have to lie, or not to lie, as the case may be." (Citations omitted; internal quotation marks omitted.) *State* v. *Felix*, 111 Conn. App. 801, 811–12, 961 A.2d 458 (2008). What a prosecutor may not do is express an opinion as to the guilt of the defendant because "[s]uch expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Moody*, 77 Conn. App. 197, 216, 822 A.2d 990, cert. denied, 264 Conn. 918, 827 A.2d 707, cert. denied, 540 U.S. 1058, 124 S. Ct. 831, 157 L. Ed. 2d 714 (2003).

Furthermore, a prosecutor's argument may quickly become improper with the use of the pronoun "I." "Undoubtedly, using the pronoun I in an argument increases the chances that appropriately structured arguments will deteriorate into expressions of personal opinion." (Internal quotation marks omitted.) Id., 217. Although "[t]he mere use of phrases such as *I would think, I would submit,* and *I really don't think,* does not transform a closing [argument] into the improper assertions of personal opinion by the [prosecutor]"; (emphasis added; internal quotation marks omitted) *State* v. *Santiago,* 103 Conn. App. 406, 421, 931 A.2d 298, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007);

see also *Jenkins* v. *Commissioner of Correction*, 52
Conn. App. 385, 400, 726 A.2d 657, cert. denied, 249
Conn. 920, 733 A.2d 233 (1999); the prosecutor is not
permitted to express an opinion as to the credibility of
witnesses. *State* v. *Bermudez*, 274 Conn. 581, 590, 876
A.2d 1162 (2005), aff'd after remand, 95 Conn. App. 577,
897 A.2d 661 (2006). If the remarks appropriately relate
to the evidence at trial and posit a reasonable conclu-
sion that could have been reached by the jury without
the prosecutor's personal knowledge of the case, they
are less likely to be improper. See *State* v. *Smith*, 110
Conn. App. 70, 84, 954 A.2d 202, cert. denied, 289 Conn.
954, 961 A.2d 422 (2008); see also *State* v. *Luster*, 279
Conn. 414, 436, 902 A.2d 636 (2006).

Unlike the situation in *State* v. *Moody*, supra, 77 Conn.
App. 197, in which the prosecutor's use of the phrases
"I believe" and "I feel" to comment on the evidence
was held not to constitute improper argument because
the comments clearly related to the strength of the
evidence and not to the prosecutor's personal belief
about the defendant's guilt; id., 217; in this case, the
prosecutor used the phrase "I think" more than once
to comment on the one element of the crime of failure
to appear for which the state had very little evidence.
The element of wilfulness, to which the prosecutor's
comments were directed, was the only contested ele-
ment of the crime. Although in *Moody* the court held
that "[b]ecause the prosecutor specifically was
addressing the strength of the evidence presented at
trial, there was no danger that the jury would infer that
his comments were based on his personal knowledge
of matters not in evidence"; id.; here, the evidence pre-
sented at trial relating to the wilfulness of the defen-
dant's conduct was certainly not overwhelming.

This language was more than the use of "proper rhe-
torical devices," as the state tries to characterize it. Cf.
*State* v. *Thompson*, 266 Conn. 440, 283, 832 A.2d 626

(2003) ("[t]he mere fact that the prosecutor employed the rhetorical device of incorporating a literary theme into his closing argument did not render his remarks improper"); *State* v. *Sargent*, 87 Conn. App. 24, 35, 864 A.2d 20, cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005) (after prosecutor commented that defendant did not hand police officer business card identifying himself as crack dealer, court held it was not improper and noted that "the comment was not expressed as a statement of personal opinion about the defendant, but was merely a rhetorical device used to counter the jury's potential unrealistic expectations regarding the availability of certain evidence"). Taken in context, this was the personal opinion of the prosecutor and was improper. "[W]hen the evidence could lead a jury to infer the factual conclusion about which the prosecutor expresses his personal opinion, we conclude that the challenged remarks fall close enough to the line to also warrant our further review." *State* v. *Dews*, 87 Conn. App. 63, 77, 864 A.2d 59, cert. denied, 274 Conn. 901, 876 A.2d 13 (2005).

B

Having concluded in part II A that the prosecutor's conduct rose to the level of impropriety, we must now determine whether that impropriety was so serious as to amount to a denial of due process. We conclude that it was.

To determine whether the defendant was deprived of his due process right to a fair trial as a result of the impropriety, we must apply the six factors set forth in *State* v. *Williams*, supra, 204 Conn. 540. "These factors include whether (1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6)

the state's case against the defendant was weak . . . ." (Internal quotation marks omitted.) *State* v. *Gordon*, 104 Conn. App. 69, 74, 931 A.2d 939, cert. denied, 284 Conn. 937, 937 A.2d 695 (2007).

Taking the *Williams* factors in order, there is nothing in the record to indicate that the defendant did anything to invite the impropriety. The second factor looks at the severity of the impropriety, for which "our Supreme Court has set a high bar." *State* v. *Dews*, supra, 87 Conn. App. 77. In *State* v. *Thompson*, supra, 266 Conn. 479–80, our Supreme Court held that the impropriety was not severe when the prosecutor repeatedly attacked the veracity of the defendant's two principal witnesses, appealed to the emotions of the jurors by urging them to give the victim's family justice and urged the jury to use impeachment evidence substantively. See *State* v. *Dews*, supra, 77–78. Using the standard set by the *Thompson* court, we conclude that the prosecutor's conduct in this case was far less egregious and that the defendant has not met the severity prong. In addition, defense counsel failed to object during trial, and "[a] failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Gordon*, supra, 104 Conn. App. 82.

The third prong measures the frequency of the instances of possible impropriety. Id., 78. Here, there were two isolated statements made during closing argument, which the prosecutor began with the words "I think." This does not rise to the level of being frequent, particularly because the improper comments occurred only during closing argument, where we typically allow some latitude, and they represented a small portion of the prosecutor's argument. See *State* v. *Kelly*, 106 Conn. App. 414, 434, 942 A.2d 440 (2008).

The fourth prong relates to the centrality of the impropriety to the issues of the case. Id. This is a focal point of our analysis. The sole issue to be determined by the jury was whether the defendant wilfully failed to appear in court on May 5, 2006. There was no question that the defendant had a court date on May 5, there was no question that he had been informed of his May 5 court date and there was no question that he did not appear in court on May 5. The jury's only job was to determine whether the defendant's failure to appear was wilful. In his closing argument, the prosecutor clearly expressed his personal opinion as to whether the defendant's conduct was wilful by arguing: "Did the defendant wilfully fail to appear in court on May 5, 2006? I think he did." The prosecutor also expressed his opinion about the guilt of the defendant, stating: "I think it's pretty safe to assume that [the defendant made up an excuse for missing his court date], ladies and gentlemen." The evidence of the defendant's guilt was not strong, yet the prosecutor gave his personal opinion about the one contested element of the crime. "It is a well established principle that the elements of a crime are critical issues in a state's case." *State* v. *Gordon,* supra, 104 Conn. App. 83. The prosecutor's comments were directed squarely at the central issue of the failure to appear charge.

Fifth, we assess the strength of the curative measures adopted by the court. The defendant did not object to the prosecutor's statements or request any curative instructions, and the court did not give any. Although the court did not provide the jury with any curative instructions, in the general jury charge, the judge instructed the jury on the basic guiding principle that "[c]ertain things are not evidence, and you may not consider them in deciding what the facts are. These include . . . arguments and statements by lawyers. The lawyers are not witnesses. What they have said in

their closing arguments is intended to help you interpret the evidence, but it is not evidence." "In the absence of a showing that the jury failed or declined to follow the court's [general] instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Gordon*, supra, 104 Conn. App. 83–84.

The sixth and final factor is the strength of the state's case. We have acknowledged, and the court pointed out, that the state did not have a particularly strong case with regard to proving the wilfulness of the defendant's conduct. The court stated that it was a very close case but that it must defer to the jury's assessment of the credibility of the witnesses. The only evidence that the state presented on the issue was the transcript of the April 4, 2006 court appearance during which it was mentioned that the defendant's next court date of May 5, 2006, would include victim contact. The state posited in its closing argument that the defendant wanted to avoid victim contact, as it would signify moving forward with the trial, which is why he failed to appear in court on May 5, 2006. The defendant testified and acknowledged that his next court date was stated on the record twice in his presence and that he did not show up in court on May 5, 2006, because he thought his next court date was May 16, 2006. Beyond that, the state presented no evidence tending to prove the wilfulness of the defendant's conduct.

The ultimate question is, in light of the conduct that we have concluded was improper, "whether the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 723, 793 A.2d 226 (2002). We emphasize that this was a one issue case. The prosecutor directed his comments at the only contested issue and expressed his personal opinion as to whether the defendant's conduct

was wilful, and thereby, in effect, did the jurors' jobs for them. It cannot be known whether the jury would have concluded that the defendant's conduct was wilful without the prosecutor's giving such a conclusion his personal stamp of approval during closing argument. Such conduct renders the trial fundamentally unfair.

After a review of the record of the entire trial, and taking into account how central the prosecutor's statements were to the sole contested issue in the case, as well as the lack of evidence presented by the state on the issue of the defendant's wilfulness, we conclude that the defendant was deprived of his right to a fair trial. Our conclusion requires the reversal of the defendant's failure to appear conviction.

### III

Finally, we address the defendant's claim that the court incorrectly found that he violated his probation. The defendant asserts that because the violation of probation charge was based on the charge of stalking in the first degree, of which he was acquitted, the finding of violation of probation cannot stand. In the alternative, the defendant claims that his original period of probation had expired prior to his arrest on the charge of stalking in the first degree. We disagree with both contentions.

The following facts are relevant to the defendant's claim. As previously noted, prior to the initiation of the current charges against him, the defendant had been convicted of stalking in the second degree and breach of the peace on March 19, 2003. He was sentenced on May 16, 2003, and given a total effective term of eighteen months incarceration, execution suspended after ninety days, and two years probation. The conditions of probation included no contact, direct or indirect, with the

stalking victim or the victim's family, including eye contact, and submission to psychological evaluation, counseling and treatment if any was deemed necessary.[7] The defendant received and signed these conditions of probation. The defendant's period of probation began on August 8, 2003, the date that he was released from prison, and was to terminate on August 8, 2005. According to the information, the defendant committed a violation of probation under § 53a-32 on or about October 26, 2004, and the state represented that a warrant was issued for his arrest on October 27, 2004. Prior to February 28, 2005, the defendant admitted the violation of probation on the basis of his failure to comply with the ordered treatment and his failure to report to his probation officer as directed. The court gave the defendant the choice either to earn a suspended sentence or to continue with his probation with all of the original conditions. The defendant chose to continue with his probation, and on February 28, 2005, the court struck his admission to the violation and continued his probation with the original conditions.[8]

On November 28, 2005, the defendant was charged with stalking in the first degree involving the stalking victim of his prior case. A warrant for the defendant's arrest for a violation of probation under § 53a-32 was issued on December 8, 2005, by *Cronan, J.,* and the defendant was arrested on December 14, 2005. A violation of probation hearing was held on September 26 and October 4, 2006, immediately following the jury verdict finding the defendant not guilty of stalking in the first degree and guilty of failure to appear in the

---

[7] The original file in this case could not be located by the Superior Court. The deputy chief clerk of the geographical area number seventeen court provided an affidavit and a partial copy of the information and a transcript of the jury's verdict and sentencing.

[8] Additional conditions of probation also were imposed at that time, including (1) continuing counseling, (2) successfully completing all phases of counseling and (3) reporting to a probation officer without confrontation.

first degree in connection with the November 28, 2005 charges. The court found after the hearing that a violation of probation had been established. The defendant's probation was revoked, and he was sentenced to serve nine months incarceration, which was the remainder of his suspended sentence.

At the conclusion of the violation of probation hearing on October 4, 2006, the state argued, and the court found, that the defendant's probationary period was tolled during the 2005 violation of probation proceedings, which pushed forward the defendant's probation termination date from August 8 to December 10, 2005. With the new date of termination being December 10, 2005, the court found that the defendant was still on probation at the time of the conduct that led to his arrest on the charge of stalking in the first degree in the present case. The court stated: "There really is no dispute as to whether [the defendant] was in violation of the conditions of probation, one of which was [that] he have no contact, direct or indirect, with the complaining victim in this case. And I did find, I do find that the defendant did have, at the very minimal, indirect contact by following the [victim] on a motor vehicle trip through Bristol and Plainville."

"[A] probation revocation hearing has two distinct components. . . . The trial court must first conduct an adversarial evidentiary hearing to determine whether the defendant has in fact violated a condition of probation. . . . If the trial court determines that the evidence has established a violation of a condition of probation, then it proceeds to the second component of probation revocation, the determination of whether the defendant's probationary status should be revoked." (Internal quotation marks omitted.) *State* v. *Bouteiller*, 112 Conn. App. 40, 51, 961 A.2d 995 (2009). "As a reviewing court, we may reverse the trial court's initial factual determination that a condition of probation has been violated only if we determine that such a finding was clearly

erroneous." (Internal quotation marks omitted.) *State* v. *Durant*, 94 Conn. App. 219, 224, 892 A.2d 302 (2006), aff'd, 281 Conn. 548, 916 A.2d 2 (2007).

## A

The defendant first argues that the court incorrectly found him in violation of his probation on the basis of his stalking the victim. The defendant contends that because he was found not guilty by the jury on the underlying charge of stalking in the first degree, the court could not have found him to be in violation of his probation.

The defendant's contention that his acquittal on the underlying stalking charge prohibits a finding of a probation violation is misplaced. "[T]he purpose of a probation revocation hearing is to determine whether a defendant's conduct constituted an act sufficient to support a revocation of probation . . . rather than whether the defendant had, beyond a reasonable doubt, violated a criminal law. The proof of the conduct at the hearing need not be sufficient to sustain a violation of a criminal law." (Internal quotation marks omitted.) Id., 226.

The defendant incorrectly asserts that it was the actual criminal charge of stalking in the first degree that was the basis of his probation violation. The court clearly based its finding on the fact that the defendant violated the conditions of his probation by having indirect contact with the victim. That finding was not clearly erroneous. Defense counsel even acknowledged during the violation of probation hearing the fact that the defendant had contact with the victim and that such contact was a violation of the defendant's probation.[9]

---

[9] "The Court: And you're not challenging at this time any finding that I might make that—putting aside the question of the timeliness of [the] violation—that the defendant, by having, as the very least, indirect contact with the victim was in violation of the conditions of probation?

"[Defense Counsel]: Based upon the evidence, Your Honor, and our failure to admit any evidence to the contrary, I feel that I couldn't be honest to the court if I said no."

Consequently, we find the defendant's claim to be without merit.

B

The defendant argues in the alternative that the court improperly found a violation of probation because his probationary period had expired by the time he engaged in the conduct that formed the basis of the finding of the violation of probation. The state asserts that the period of probation was tolled beginning with an arrest warrant being issued for the defendant for a violation of probation on October 27, 2004, and, as such, he was still under probation when he engaged in indirect contact with the victim on October 23, 2005, in violation of his probation. We agree with the state.

Under General Statutes § 53a-31 (b), "[i]ssuance of a warrant or notice to appear for violation pursuant to section 53a-32 shall interrupt the period of the sentence as of the date of such issuance until a final determination as to the violation has been made by the court. . . ." The case law is clear that once a warrant for a violation of probation is issued, the remainder of the time on the defendant's sentence is to be served at the conclusion of the probation violation proceedings. "The plain language of § 53a-31 (b) provides that the period of the sentence is interrupted by the issuance of a warrant, referring to a tolling of the time remaining on a defendant's sentence. This ensures that if a defendant has a six month suspended sentence, for example, and a violation of probation warrant is issued and the violation hearing is not concluded for one year that the defendant still has six months remaining on the sentence." *State* v. *Johnson*, 75 Conn. App. 643, 657, 817 A.2d 708 (2003); see also *State* v. *Klinger*, 50 Conn. App. 216, 222, 718 A.2d 446 (1998) (issuance of warrant for violation of probation tolled term of defendant's

probation, which, had warrant not been issued, would have terminated on original termination date).

There is no dispute that the defendant's probation began on August 8, 2003, the day that he was released from prison, and initially was to terminate on August 8, 2005.[10] Under § 53a-31 (b), his period of probation was tolled beginning on October 27, 2004, when a warrant was issued for a violation of probation, until February 28, 2005, the date that the court struck his admission to the probation violation and concluded the probation violation proceedings. As a result of the tolling, the new date for the termination of the defendant's probation was December 10, 2005. As illustrated previously, he unquestionably violated the terms of his probation by indirectly contacting the victim on October 23, 2005, well within the period of his probation.

The defendant's argument that his period of probation was not tolled because his 2005 violation of probation hearing ended with the court's striking his admission of a violation on February 23, 2005, and continuing him on his original conditions of probation is without merit. He claims that by striking the violation of probation, the court effectively dismissed the action so that the defendant's probation would continue, and therefore the tolling of § 53a-31 (b) did not apply. The statute clearly states that it is the issuance of the warrant that tolls the period of probation; whether the probationary period is tolled does not depend on the outcome of the violation of probation proceedings. After a careful review of the statute, we find no support for the defendant's contention that if a violation of probation hearing ends in a dismissal, his probationary

---

[10] "A period of probation or conditional discharge commences on the day it is imposed, except that, where it is preceded by a sentence of imprisonment with execution suspended after a period of imprisonment set by the court, it commences on the day the defendant is released from such imprisonment. . . ." General Statutes § 53a-31 (a).

period is not tolled. The defendant's claim, therefore, fails.

The judgment of conviction of failure to appear in the first degree is reversed and the case is remanded for a new trial on that charge. The judgments are affirmed in all other respects.

In this opinion GRUENDEL, J., concurred.

BISHOP, J., dissenting. Don Quixote cried, "facts are the enemy of truth."[1] In the law, it is a truism that it is improper for a prosecutor to express a personal opinion while arguing to the jury. To the extent that language is determinate, one might believe that expressions by a prosecutor such as "I think" or "I do not think" would be uniformly disapproved as improper expressions of personal opinion, but that is not necessarily so. In the life of the law, we learn that sometimes factual context trumps generalities. I believe this may be such a case.

I agree with my colleagues that the prosecutor's statements in closing argument to the jury appear to be expressions of personal opinion. The teaching of our Supreme Court, however, is that not all statements of personal opinion are what they seem to be, and, even if a prosecutor improperly expresses his or her personal opinion, an isolated impropriety by a prosecutor does not warrant reversal of a judgment of conviction unless the prosecutor's conduct is grossly egregious. Because, in this case, the prosecutor's comments of questionable propriety were not egregious, I cannot conclude, in light of our Supreme Court's recent treatment of claims of prosecutorial impropriety, that the defendant, Gary D. Gibson, was deprived of a fair trial. Accordingly, I respectfully dissent.

---

[1] D. Wasserman, Man of La Mancha (Random House Publishing Group, 1966).

The underlying facts are straightforward. The record reveals that the defendant failed to appear in court on an assigned date. At trial, he conceded that he had been notified to be in court on the date in question, but he claimed that his absence was due to a mistake. He contested only the state's claim of wilfulness, an essential element of the offense of failure to appear. In closing argument, the prosecutor stated: "Did the defendant wilfully fail to appear in court on May 5, 2006? I think he did. Is it safe to assume [that the defendant], sometime after May 5 when he realized that he got rearrested, conveniently came up with the new court date of May 16? I think it's pretty safe to assume that, ladies and gentlemen. He never called the clerk's office, never called his attorney, never called anybody to see if his court date was changed. But he got that court date on April 2, and they told him it was May 5, twice." The defendant claims that these statements by the prosecutor constituted improper expressions of personal opinion that deprived him of a fair trial.

Our analytical pathway is guided by *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004).[2] We assess

[2] If, however, the defendant had claimed that the prosecutor's conduct bore directly on a specific constitutional right, I would be less confident of our proper analytical route. In 1996, in *State* v. *Cassidy*, 236 Conn. 112, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part by *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000), our Supreme Court appeared to adopt the view that once a defendant has established prosecutorial impropriety bearing on a constitutional right, the state has the burden of demonstrating that its impropriety did not deprive the defendant of a fair trial. Id., 129. In *Cassidy*, the court stated: "Because the state's case rested entirely upon the uncorroborated testimony of the victim; because the relative credibility of the defendant and the victim was critical to the jury's resolution of the case; because there was no independent evidence of the crimes to assist the jury in that determination; and because the trial court failed to give a curative instruction as requested by the defendant, *we are not persuaded beyond a reasonable doubt that the jury was not influenced by the prosecutor's improper closing argument. The state, therefore, has failed to establish that the remarks were harmless.*" (Emphasis added.) Id., 131–32.

Thus, in *Cassidy*, the court imposed the burden of proving harmlessness on the state once it determined that the prosecutor's comments bore on

whether the prosecutor's comments were improper and, if so, whether the defendant was deprived of a fair trial. Id., 572–73. This analysis should take place sequentially. *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003). "[Impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." Id.

In the case at hand, although I am inclined to agree with the majority that the prosecutor's comments appear to be expressions of personal opinion, our Supreme Court has taught us that such expressions by prosecutors are not always improper, particularly if the

the defendant's constitutional right to be present during the entirety of the trial. Although the court in *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000), overturned *Cassidy*'s holding that such comments actually infringe on a defendant's constitutional right to be present during trial, the principle of *Cassidy* appears intact.

When the court in *Stevenson*, however, abandoned the requirement that claims of prosecutorial impropriety be analyzed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and posited, in its stead, the requirement that a defendant on appeal demonstrate both an impropriety and its harmlessness by utilizing the factors enumerated in *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987), the court, sub silentio, may have relieved the state of demonstrating the harmlessness of an impropriety bearing on a constitutionally protected right. Given the chance to clarify this issue in *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), the court declined. There, even though the court found numerous instances of prosecutorial impropriety, none appears to have directly infringed on a constitutional right. The court declined a request by the defendant for the court to establish a bright line rule that once a defendant on appeal establishes prosecutorial impropriety, the burden should shift to the state to prove the harmlessness of the impropriety beyond a reasonable doubt.

Nevertheless, *Cassidy* and *Warholic* can be harmonized on the basis that when the claimed prosecutorial impropriety directly implicates a specific constitutional right, such as, perhaps, the right of confrontation, or to present a defense, or to remain silent, the burden of harmlessness will still shift to the state, but when the claim of impropriety does not directly bear on a specific constitutional right but, rather, implicates due process generally, the defendant retains the burden of demonstrating both the impropriety and the attendant denial of due process.

trial record contains evidence consistent with the stated opinion. Therefore, what appears to be an opinion may also be viewed as merely a rhetorical device employed to convince the jury to draw an inference from the evidence.

In general, statements of personal opinion by prosecutors are viewed as improper because they are a "form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 35, 917 A.2d 978 (2007). The *Fauci* court also commented: "We have held, however, that [i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) Id., 36. Thus, the fact that there is some evidence regarding the subject of the claimed improper comment suggests that "I" statements made by a prosecutor need not always be viewed as the expression of personal opinion but, if drawn from the evidence and not whole cloth, can be seen as a mere rhetorical device used to urge a jury to draw certain inferences from the evidence. This is so even if the prosecutor uses such terms

as "I think" or "I believe." Even though the Supreme Court has cautioned against the use of such phrases, the court has commented: "[W]e recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 436, 902 A.2d 636 (2006). The court continued: "[T]he state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows . . . . Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge, his or her occasional use of the first person does not constitute [impropriety]." (Internal quotation marks omitted.) Id.

In *State* v. *Ancona*, 270 Conn. 568, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005), a case involving claims of police misconduct, the court did not find the following comments by a prosecutor to be the improper expression of personal opinion regarding witness credibility: "I don't believe for a minute that all these officers were either true to themselves or spoke the whole truth"; (internal quotation marks omitted) id., 607; and, "[a] lot of the officers that were there that night weren't involved in the search for the truth. And when they testified here they weren't involved in the search for the truth." (Internal quotation marks omitted.) Id., 608. The court's reasoning is instructive. In finding that the prosecutor's comments did not constitute the impermissible expression of personal opinion, the court noted that because there was sufficient circumstantial evidence to support the prosecutor's theory that a number of police officers had engaged in a coverup, the prosecutor's argument urging

the jury to credit that theory was not improper, and, although the prosecutor should have couched his argument in terms of the state's theory of the case rather than expressing it in terms of his belief, his comment regarding his belief was isolated and did not carry the suggestion that he possessed information unavailable to the jury. Id. The court continued: "We nevertheless agree with the defendant that the state's attorney should not have expressed his own belief that those officers had testified untruthfully. Rather, he should have couched his argument in terms of the state's theory of the case. . . . Moreover, the state's attorney's use of the first person did not carry the suggestion that he possessed information unavailable to the jury; on the contrary, the state's attorney recited the specific evidentiary predicate for the inference that he was urging the jury to make." Id. It is noteworthy that in *Ancona*, the court found that the prosecutor's comments were not improper even though the court found that the prosecutor had couched his statements in terms of his personal beliefs.

In *State* v. *Luster*, supra, 279 Conn. 414, a case in which there was a significant dispute over whether the defendant had intended to kill or cause physical injury to the decedent, our Supreme Court found that the following comment was merely a rhetorical device and not an expression of personal opinion: "When you bring a pistol to a fistfight, and you cause the death of another person with a shot to the heart and a shot to the back, that says something about his intent. Was he trying to cause serious physical injury? *I don't think so.*" (Emphasis in original; internal quotation marks omitted.) Id., 437. As in this case, the issue in *Luster* was one of intent.

The lessons of *Ancona* and *Luster* are that not all statements couched as personal opinion are improper or even what they seem to be, and their propriety likely

depends on whether there is evidence in the record from which a jury may determine that the prosecutor is simply urging it to draw inferences. In determining that the prosecutor's comment was not an expression of personal opinion, the *Luster* court found, rather, that the statement was a device to suggest an inference that could be drawn from the evidence. Id.

In the case at hand, in which the jury had heard conflicting reasons for the defendant's failure to appear in court on the assigned date, the prosecutor's comments can be seen as merely suggesting an inference that could be drawn from the evidence. Additionally, the prosecutor's comments did not suggest that he had some special knowledge regarding whether the defendant's failure to appear in court on the assigned date was wilful or merely a mistake. Thus, I cannot conclude that the comments likely confused the jury.

Because it is a very close question whether these comments were expressions of personal opinion or a rhetorical device used to argue an inference from the evidence, I consider, as well, whether the comments, if improper, deprived the defendant of a fair trial.[3]

To assess whether prosecutorial impropriety has deprived a defendant of his due process right to a fair trial, "we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to

---

[3] Although I recognize that the Supreme Court has suggested that the *Stevenson* analysis is a two step process, I note, as well, that the court has looked to the factors enunciated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), when the issue of propriety is a close call. Thus, in *State* v. *Grant*, 286 Conn. 499, 542, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008), the court noted: "We need not decide whether the prosecutor's comment rose to the level of an impropriety, however, because even if it was improper, we conclude that any impropriety was harmless and did not deprive the defendant of a fair trial."

due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted). *State* v. *Salamon*, 287 Conn. 509, 551–52, 949 A.2d 1092 (2008). Put another way, the question we must answer is "whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 50. Indeed, our Supreme Court has opined that to establish the denial of a fair trial, a defendant must demonstrate " 'substantial prejudice.' " *State* v. *Coney*, supra, 266 Conn. 806.

In making this assessment, we turn to the six factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), namely: "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) In addition, in assessing the question of impropriety, we examine the record to determine whether trial counsel timely objected to the alleged improprieties.

In this instance, the *Williams* factors point in both directions. The prosecutor's comments regarding the defendant's wilfulness were not invited by defense counsel; they concerned the only contested issue in the case; and, as noted by the trial judge, the state's case was not strong. On the other hand, the impropriety, if so, was not severe, egregious or pervasive, and, even though the court gave no curative instruction tailored to the comments, the court's general instructions were

on point. Finally, trial counsel did not object to the comments.

In judging the severity of the conduct when defense counsel does not object, our Supreme Court has opined that "only instances of grossly egregious conduct will be severe enough to mandate reversal." *State* v. *Thompson,* 266 Conn. 440, 480, 832 A.2d 626 (2003). Indeed, there appear to be degrees of egregiousness with only the most egregious warranting reversal of the judgment. The court, in *Thompson,* concluded that even though it was " 'inexcusable' "; id.; for the prosecutor to suggest that defense witnesses were facing impending charges, the question it confronted was not whether the prosecutor should be disciplined but, rather, whether the defendant was deprived of a fair trial by the conduct. The court concluded that the remark was not "sufficiently egregious" to warrant reversal. Id.

In assessing the severity of the claimed impropriety, it also appears to be highly relevant that the possible impropriety was isolated. For example, in *State* v. *Heredia,* 253 Conn. 543, 754 A.2d 114 (2000), the court emphasized the absence of a pattern of improper behavior in making its determination that the defendant had not been denied a fair trial. The court commented: "[T]here was no pattern of prosecutorial [impropriety], and . . . the sole, isolated instance of improper argument did not deprive the defendant of a fair trial." Id., 561. Similarly, the court in *State* v. *Floyd,* 253 Conn. 700, 756 A.2d 799 (2000), opined that a defendant "may not prevail under [*State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989)] or the plain error doctrine [embodied in Practice Book § 60-5] unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to

a fair trial . . . ."[4] (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 749.

Even when an instance of impropriety relates to a central issue in the case, it is not necessarily fatal to a defendant's conviction. In *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), the Supreme Court affirmed the defendant's conviction despite its finding that the prosecutor had committed numerous acts of impropriety, including one that related to a central issue in the case. There, the court found that the prosecutor committed improprieties by attempting to elicit the jury's sympathy for the victim by gratuitously remarking that at the time of the alleged sexual assaults, the victim was a "cute little kid," by appealing to the jury's emotions in stating that the victim's mother refused to come to the state's attorney's office and that child molesters are "out there" and "among us," and by committing a *Singh* violation[5] during the defendant's cross-examination. (Internal quotation marks omitted.) Id., 374–76. The court concluded, as well, that the state's case was not strong. Id., 397. Nevertheless, and despite finding that the prosecutor's *Singh* violation impacted the victim's credibility, the central issue in the case, the court determined that the prosecutor's improper conduct did not warrant a new trial. The *Warholic* court stated: "In sum, we conclude that, although the state's case was reliant on [the victim's] credibility, the one instance of [impropriety] that was central to the issue of credibility was not severe and was cured by the trial court's general instructions, and that the other instances of [impropriety] were either not severe or were cured by the trial

[4] Although *Floyd* predates *Stevenson*, its wisdom appears to remain pertinent in an appeal in which a defendant raises an unpreserved claim of prosecutorial impropriety.

[5] In *State* v. *Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002), our Supreme Court held that it is improper to ask a witness to comment on another witness' veracity, in large part because determining the credibility of witnesses is solely within the province of the jury.

court's prompt curative instructions. We therefore conclude that the defendant was not deprived of his due process right to a fair trial."[6] Id. 404. As in *Warholic*, the court in this matter gave the general instruction that the jury is required to come to its decision on the basis of the evidence and that arguments of counsel do not constitute evidence. Against that jurisprudential backdrop, I cannot conclude that the prosecutor's possibly improper conduct in the case at hand so infected the trial that the defendant was deprived of a fair trial.

Additionally, it is significant that the defendant did not object at trial to the claimed impropriety. In this regard, our Supreme Court has opined: "Although a defendant's failure to object to improprieties does not preclude review of his claims . . . [w]hen defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . [T]he fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citation omitted; internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 782, 931 A.2d 198 (2007).

---

[6] Thus, it appears that as to the *Williams* factor concerning curative instructions, when the court has given a general instruction distinguishing argument from evidence and the defendant has both failed to object to a claimed impropriety and failed to seek a curative instruction, the lack of a specific curative instruction is not fatal to maintaining a judgment of conviction. See also *State* v. *Ancona*, supra, 270 Conn. 568, in which the court found some improprieties but concluded, nevertheless, that the defendant was not deprived of a fair trial and noted that "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary. . . . In light of the brevity and isolated nature of the improprieties, the trial court's general instructions likely minimized any harm that may have resulted from the improprieties." (Citation omitted; internal quotation marks omitted.) Id., 616–17.

In *State* v. *Ritrovato*, 280 Conn. 36, 905 A.2d 1079 (2006), the court commented: "We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover as the Appellate Court has observed, defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently [claims of prosecutorial impropriety are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) Id., 68–69.

Finally, in assessing a claim of prosecutorial impropriety, our Supreme Court has not ever suggested that the nature or seriousness of the charged crime is relevant to our assessment on appeal. Indeed, due process has no sliding scale. Thus, it is reasonable to believe that if multiple instances of prosecutorial impropriety, including one bearing on the principal issue in a close case, are insufficient to warrant reversal of a judgment of conviction for a heinous, violent crime, an isolated instance of impropriety relating to a central issue in a close case involving a victimless, nonviolent crime will be similarly inadequate to entitle a defendant to a new

trial. This is the lens through which I view the case at hand, as I believe it is only by the consistent application of legal principles that the law garners public trust.

Applying the lessons of our Supreme Court to the present case takes me on a path away from the majority. Because there was trial evidence bearing on the issue of wilfulness, the prosecutor's comments can be seen not as expressions of personal opinion but, rather, as a rhetorical device aimed at an inference the jury could fairly make from the evidence. Additionally, defense counsel did not object to the comments, and even though the remarks under scrutiny bore on a central issue in a close case, they were not severe or egregious, let alone grossly egregious, nor were they pervasive. For the foregoing reasons, I cannot conclude that the defendant was deprived of his due process right to a fair trial, and, therefore, I would affirm the judgment of conviction. Accordingly, I respectfully dissent.